# Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
MASTER DOCKET 18-MD-2865(LAK)
CASE NO. 18-CV-09797

IN RE:

CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND SCHEME LITIGATION

C O N F I D E N T I A L

REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL

EXAMINATION OF

GUNNAR VOLKERS

DATE: June 8, 2021

REPORTED BY: MICHAEL FRIEDMAN, CCR

G U N N A R V O L K E R S,

called as a witness, having been first duly sworn according to law, testifies as follows:

EXAMINATION BY MR. OXFORD:

Q Good afternoon, Mr. Volkers?
A Good afternoon.
Q How are you today?
A I'm fine. How are you?
Q So, fine. Could you please state your full name for the record?
A My name is Gunnar Volkers.
Q Spell that for the court reporter, please.
A First name G-U-N-N-A-R, surname, V-O-L-K-E-R-S.
Q Thank you.
Are you currently employed by North Channel Bank?
A Yes, I am.
Q What is your -- what is your position with North Channel Bank?
A I'm a managing director of North Channel Bank since January 9, 2017. My responsibilities are risk and regulatory

A Yeah, I do.

(Whereupon a discussion was held off the record.)

Q Sir, so we're clear, do you have the Omineca reclaim application in front of you?

A Yes, I have, yeah.

Q Did NCB generate some of the documents that are attached to this application?

A All the documents that carry the logo of North Channel Bank have been produced by North Channel Bank.

Q And what are those documents called?

A These are dividend credit advices, "DCAs" we call them. And they show, as is normal, how many shares are held of which company at -- and also, of course, what advice in or other reference to the stock exchange there might be.

Then, in this case, it is advising the dividend payment that on -- in this particular case, it's regarding Coloplast, dated the 14th of May in '14. It shows how

high the dividend is, which is four kroner per share, and it shows also the 700,000 shares were their holdings at the 8th of May, which is important because the ex date for registering for the dividend is on the 9th of May. The dividend details are -- are mentioned.

And since it's a Danish company that pays its dividends in Danish kroner, and since North Channel Bank does not have any currency accounts except for dollar and Euro, there's an exchange rate there because the -- those monies received or monies in foreign currency will always be reflected in Euros in our books.

Q Did NCB perform a thorough search of its records to determine whether NCB, in fact, held 700,000 shares of Coloplast on May 8, 2014 for its customer, the Omineca Pension Plan?

A Indeed, we did look into that, and we came to the conclusion that the bank did not, at any time, hold any shares in the setup that has been made. I can actually say that the way the structure had been designed,

the pension plan as well as the broker as well as the sellers of the shares, they were always short sellers, were all customers in the bank.

And in this connection, it was like creating a closed shop where the input into the custody system of the bank that was supported by DWP Bank as the system provider, it didn't need anything else than giving in the ISO number and an amount of shares. And they were netted out at the end of the day because that is how it was set up.

The short seller would sell by other broker to the pension plan. And if you take all this within one day within the same bank, you would have it in the same custody system and it adds up to zero.

Q So was the statement on this dividend credit advice that the Omineca plan held 700,000 shares of Coloplast May 8, 2014 true or false?

MR. BAHNSEN: Objection to the form.

A I see this as a falsification, as do my colleagues.

Q There's a section on the credit advice. I think you covered this earlier.

It says "dividend income" and there's a number of 2.8 million Danish krones.

Do you see that?

A Yes.

Q And what does that mean?

A Well, it means that 700,000 shares of Coloplast yielding four Danish kroner ends up in a dividend -- I will repeat.

I said that that 700,000 shares, yielding four Danish kroner per unit add up to 2.8 million as a cross dividend income. Then you have the withholding tax of 27 percent that is shown here on the credit advice, and that is -- and only shown in Euro.

So if we take the Euro amounts, the gross dividend income in Euro was 374,000. The withholding tax was 101,000. The actual net that should be credited over to Omineca was then $273,000.

Q Did NCB perform a thorough search of its records to determine whether NCB

received a dividend in the amount of 273,094 Euros and 9 cents in connection with Omineca plan's purchase of Coloplast shares in May of 2014?

A We have gone through our ledger in '14 and in '15 in search of dividend payments and in search of payments for the acquisition of shares. And we have not found any such payments, neither ingoing nor outgoing.

Q So is the -- where the dividend credit advice represents that there was an actual payment or dividend payment for Coloplast shares to the Omineca plan in the sum of 273,094 Euros and 9 cents, is that true or false?

MR. BAHNSEN: Objection to form.

A There have been no physical payments in this structure. I've mentioned it before. I called those up.

These are only bookings.

Q So there was no real world -- withdrawn.

Was there any real world cash movement in connection with this dividend credit advice?

A There has been going in or out of the bank -- I said no liquidity in terms of money has been flowing in or out of the bank.

Q Turning to the next credit advice, sir, the second one is dated April 4, 2014.

Do you see that?

A Yes.

Q It states that the Omineca plan received a dividend of 1.870357.51 million Euros on 10,000 shares of Maersk, from which 504,996 Euros and 53 cents was withheld as tax, resulting in an actual payment of 1.3653098 million Euros.

Do you see that?

A Yeah. But I would object to the actual payment, because that would indicate that there has been a transaction -- a payment transaction. This is not the case that only the internal bookings on the accounts -- I said I objected to the payment --

Q The term "actual payment" --

A The term "actual payment," because there were no actual payments. There were only internal bookings.

There were no transactions.

Q So my next question was: Did NCB search its records for evidence of the Omineca Pension Plan -- let me restart the question again.

Did NCB search its records for evidence of the Omineca Pension Plan's purchase of A.P. Moeller-Maersk shares in March of 2014?

A Yes, we did.

Q Did NCB, in fact, hold 10,000 shares of A.P. Moeller-Maersk on behalf of the Omineca Pension Plan in March of 2014 as described on this dividend credit advice?

MR. BAHNSEN: Object to form.

A No. No real shares were held.

Q Did NCB search its records for evidence of the receipt of any dividend income in April 2014 in connection with the Omineca Pension Plan's purchase of A.P. Moeller-Maersk shares?

A Yes, we did.

Q Did NCB, in fact, receive any dividend income on Maersk shares as described in this dividend credit advice?

MR. BAHNSEN: Objection to form.
A No payments of this size were seen and no transaction of this size has taken place.
Q So is this dividend credit advice true or false?
A It is not reflecting the truth, so we see it as a falsification.
Q Turning to the third dividend credit advice, it's dated March of 2014. March 26, 2014.
Do you see that?
A Yes.
Q And this states, does it not, that the Omineca Pension Plan received a dividend of 7,514,728.87 million Euros on 12.5 million shares of Novo Nordisk from which two point -- sorry -- 2.028976 and 79 cents million Euros was withheld as tax, resulting in a payment of 5,485,752 Euros and 8 cents.
Do you see that?
A I see that.
Q Did NCB search its records for evidence of the Omineca Pension Plan's purchase of Novo Nordisk shares in March of

2014?

A Indeed we did.

Q Did NCB, in fact, hold 12.5 million shares of Novo Nordisk on behalf of the Omineca Pension Plan in March of 2014 as described in this dividend credit advice?

MR. BAHNSEN: Object to form.

A No, NCB did not hold Novo Nordisk shares.

Q Did NCB search its records for evidence of the receipt of any dividend income in connection with the Omineca plan's purchase of Novo Nordisk shares in March of 2014?

A We did.

Q And did NCB, in fact, receive the dividend income on Novo Nordisk shares as described in this dividend credit advice?

MR. BAHNSEN: Object to the form.

A No.

Q Is this dividend credit advice true or false?

A It does not reflect the reality. It's a falsification.

Q Turning to the fourth dividend

credit advice for Omineca, it's dated March 25, 2014.

Do you see that?

A I see it.

Q This states that the Omineca plan received a dividend of 477,641 Euros and 5 cents on 550,000 shares of Pandora from which 128,963 Euros, 8 cents was withheld, resulting in an actual payment of 348,677 Euros and 97 cents.

Do you see that?

A I see that.

Q Did NCB search its records for evidence of the Omineca plan's purchase of Pandora shares in March of 2014?

A We did.

Q Did NCB, in fact, hold 550,000 shares of Pandora on behalf of the Omineca plan in March of 2014 as described in the dividend credit advice?

MR. BAHNSEN: Object to form.

A NCB did not hold any Pandora shares and not for Omineca either.

Q Did NCB search its records for evidence of the receipt of any dividend

income in connection with the Omineca plan's purchase of Pandora shares in March of 2014?

A Yes, we did.

Q Did NCB, in fact, receive the dividend income on Pandora shares as described in this credit advice?

MR. BAHNSEN: Object to form.

Q So the question is: Did NCB, in fact, receive dividend income on Pandora shares as described in this dividend credit advice?

MR. BAHNSEN: Same objection.

A This is not the case.

Q So was this dividend credit advice true or false?

MR. BAHNSEN: Objection.

A It's not true.

Q The fifth and final dividend credit advice for Omineca, the Omineca plan, is dated April 9, 2014.

Do you see that?

A Yes.

Q This represents that the Omineca plan received a dividend of 587,897 Euros, 41 cents on 130 -- sorry -- 163,000 shares of

Tryg, T-R-Y-G, from which 158,732 Euros, 30 cents was withheld as tax, resulting in an actual payment of 429,165 Euros and 11 cents.

Do you see that?

A I do.

Q Did NCB search its records for evidence of the Omineca Pension Plan's purchase of Tryg shares in April of 2014?

A We did.

Q Did NCB, in fact, hold 163,000 shares of Tryg on behalf of the Omineca Pension Plan in April 2014 as described in this dividend credit advice?

MR. BAHNSEN: Object to the form.

A The bank did not hold any Tryg shares and not for Omineca either.

Q Did NCB search its records for evidence of the receipt of any dividend income in connection with the Omineca plan's purchase of Tryg shares from 2014?

A Yes, we did.

Q And did NCB, in fact, receive the dividend income on Tryg shares as described in this dividend credit advice?

MR. BAHNSEN: Object to the form.

A This is not the case.
Q So is this dividend credit advice true or false?
MR. BAHNSEN: Objection.
A It is not true. We see it as a falsification.
Q That's all I have for that exhibit at this time.
Can I ask you to turn to Tab 4 of your binder, which is Exhibit 3203, the Vanderlee application reclaims?
(Whereupon the above mentioned was marked for Identification.)
Q This is two applications submitted by the Vanderlee Technologies Pension Plan in May of 2014.
Can you tell me if the documents on Page 4 and 12 through 16 of the exhibit are generated by NCB?
A The dividend credit advices that carry the logo of the bank are -- have been created by the bank.
Q And they were generated for Vanderlee Technologies Pension Plan.
Right?

A That is correct.

Q Now, turning to the first of these, dated May 14, 2014.

Do you see that?

A Yes.

Q Okay. This credit advice states that the Vanderlee Technologies Pension Plan received a dividend of 411,511 Euros, 64 cents, for 770,000 shares of Coloplast, from which 111,108 Euros and 14 cents was withheld as tax, resulting in an actual payment of 300,403 Euros and 50 cents.

Do you see that?

A I do.

Q Did NCB search its records for evidence of the Vanderlee Technologies Pension Plan's purchase of Coloplast shares in May of 2014?

A We did do so.

Q Did NCB, in fact, hold 770,000 shares of Coloplast on behalf of the Vanderlee Technologies Pension Plan as described in the dividend credit advice?

MR. BAHNSEN: Object to the form.

MS. RICE: Objection.

A The bank never held any shares of Coloplast, not for Vanderlee Technologies Pension Plan, either.

Q Did NCB search its records for evidence of the receipt of any dividend income in connection with the Vanderlee Technologies Pension Plan's purchase of Coloplast shares in May of 2014?

A We did so.

Q Did NCB, in fact, receive the dividend income on Coloplast shares as described in this dividend credit advice?

A No.

MR. BAHNSEN: Objection.

MS. RICE: Objection.

Q Sir, is this dividend credit advice true or false?

MR. BAHNSEN: Objection.

MS. RICE: Objection.

A It's not true. It does not reflect the reality.

Q Turning, if I could, sir, to Page 12 of the exhibit? Could you turn -- you should have some Bates numbers at the bottom right-hand side. 887 is the last

number.

Do you have that?

A I have it.

Q And that's the March 24, 2014 dividend credit advice?

A Yes.

Q And that states that the Vanderlee Technologies Pension Plan received a dividend of 1,309,320 Euros and 22 cents on 4.9 million shares of Danske Bank, from which 353,516 Euros and 46 cents was withheld as tax, resulting in an actual payment of 955,803 Euros and 76 cents.

Correct?

A That's correct.

Q Did NCB search its records for evidence of the Vanderlee Technologies Pension Plan's purchase of Danske Bank shares in March of 2014?

A We did.

Q Did NCB, in fact, hold 4.9 million shares of Danske Bank on behalf of the Vanderlee Technologies Pension Plan as described in this credit advice?

MS. RICE: Objection.

A The bank did not hold any Danske Bank shares at any time and not for Vanderlee either.

Q Did NCB search its records for evidence of the receipt of any dividend income in connection with the Vanderlee Technologies Pension Plan's purchase of Danske Bank shares in March of 2014?

A Yes, we did.

Q And did NCB receive the dividend income on Danske Bank shares as described in this dividend credit advice?

A No.

MS. RICE: Objection.

Q Is this dividend credit advice true or false?

MS. RICE: Objection.

A We see it as a falsification.

Q Turning to the next number ending Bates 888, you have the March 25th dividend credit advice relating to Pandora.

Does this state that the Vanderlee Technologies Pension Plan received a dividend of 596,617 Euros and 10 cents on 687,000 shares of Pandora, from which 161,086 Euros

and 62 cents was withheld as tax resulting in an actual payment of 435,530 Euros and 48 cents.

Do you see that, sir?

A Yes, I do.

Q Did NCB search its records for evidence that the Vanderlee Technologies Pension Plan purchased those Pandora shares in March?

A We did.

Q Did NCB, in fact, hold 687,000 shares of Pandora on behalf of the Vanderlee Technologies Pension Plan in March of 2014 as described in this dividend credit advice?

MS. RICE: Objection.

A The bank didn't hold any Pandora shares at any time. Not for Vanderlee, either.

Q Did NCB search its records for evidence of the receipt of any dividend income in connection with the Vanderlee Technologies Pension Plan's purchase of Pandora shares in March of 2014?

A We did.

Q And did NCB, in fact, receive the

dividend income on Pandora shares as described in this dividend credit advice?

A No payments were received.

Q So is this dividend advice true or false?

MS. RICE: Objection.

A It does not reflect the realities, so we see it as a falsification.

Q Okay. All right.

Turning to the next dividend credit advice, which is dated March 26th of 2014 relating to Novo Nordisk.

Do you see that, sir?

A I do.

Q And it states that the Vanderlee Technologies Pension Plan received a dividend of 8,416,496 Euros, 33 cents on 14 million shares of Novo Nordisk, from which 2,272,454 Euros and 1 cent was withheld as tax, resulting in an actual payment of 6,144,042 Euros and 32 cents.

A I see that.

Q Did NCB search its records for evidence of the Vanderlee Technologies Pension Plan's purchase of Novo Nordisk

shares in March of 2014?

A We did.

Q Did NCB, in fact, hold 14 million shares of Novo Nordisk on behalf of the Vanderlee Technologies Pension Plan in March of 2014 as described on the dividend credit advice?

MS. RICE: Objection.

A The bank never held any Novo Nordisk shares. Not for Vanderlee Technologies either.

Q Did NCB search its records for evidence of the receipt of any dividend income in connection with the Vanderlee Technologies Pension Plan's purchase of Novo Nordisk shares in March of 2014?

A Indeed we did.

Q And did NCB, in fact, receive the dividend income on Novo Nordisk shares as described in this dividend credit advice?

MS. RICE: Objection.

A It's not -- this is not the case.

Q So was this dividend credit advice true or false?

A It is false.

MS. RICE: Objection.

Q The next dividend credit advice is dated April 4, 2014, and relates to A.P. Moeller-Maersk.

Do you see that?

A Yes.

Q It states that the Vanderlee Technologies Pension Plan received a dividend of 2,197,670 Euros and 7 cents on 11,750 shares of A.P. Moeller-Maersk, from which 593,370 Euros and 92 cents was withheld as tax, resulting in an actual payment of a hundred and -- 1,604,299 Euros and 15 cents.

Do you see that?

A Yes, I do.

Q Did NCB search its records for evidence of the Vanderlee Technologies Pension Plan's purchase of A.P. Moeller-Maersk shares in March of 2014?

A Yes, we did.

Q Did NCB, in fact, hold 11,750 shares of Maersk on behalf of the Vanderlee Technologies Pension Plan in March of 2014 as described in this dividend credit advice?

MS. RICE: Objection.

A At no time has -- have any Moeller-Maersk shares been in its books and not on behalf of Vanderlee, either.

Q Did NCB search its records for evidence of the receipt of any dividend income in connection with the Vanderlee Technologies Pension Plan's purchase of Moeller-Maersk shares in March 2014?

A Yes, we did.

Q Did NCB, in fact, receive the dividend income on Moeller-Maersk shares as described in this dividend credit advice?

MS. RICE: Objection.

A No.

Q So is this dividend credit advice true or false?

MS. RICE: Objection.

A It is false.

Q The next dividend credit advice is dated April 9th of 2014.

Do you see that?

A I see that.

Q And it again relates to the Tryg shares.

Correct?

A Correct.
Q And this states that the Vanderlee Technologies Pension Plan received a dividend of 641,998 Euros and 40 cents on 178,000 shares of Tryg, from which 173,399 Euros, 57 cents was withheld as tax, resulting in an actual payment of 468,658 Euros and 83 cents.
Do you see that?
MR. BAHNSEN: Objection to the form. I think you may have misread one of the numbers.
MR. OXFORD: Okay. Well, just to clear up that objection, which I appreciate.
Q Does this state that the Vanderlee Technologies Pension Plan received a dividend of 641,998 Euros and 40 cents on 108 -- sorry, 178,000 shares of Tryg, from which 173,390 -- 339 Euros and 57 cents was withheld as tax, resulting in an actual payment of 468,658 Euros and 83 cents?
A Yes, it states that.
Q Did NCB search its records for evidence of the Vanderlee Technologies Pension Plan's purchase of Tryg shares in

April of 2014?

A We did do so.

Q Did NCB, in fact, hold 178,000 shares of Tryg on behalf of the Vanderlee Technologies Pension Plan in April 2014 as described in this dividend credit advice?

MS. RICE: Objection.

A The bank did at no time hold Tryg shares, and not for Vanderlee, either.

Q Did NCB search its records for evidence of any receipt of any dividend income in connection with the Vanderlee Technologies Pension Plan's purchase of Tryg shares in April of 2014?

A Yes.

Q Did NCB, in fact, receive the dividend income on Tryg shares as described in this dividend credit advice?

MS. RICE: Objection.

A No.

Q So is this dividend credit advice true or false?

MS. RICE: Objection.

A It is false.

Q Let's go off the record for a

moment.

THE VIDEOGRAPHER: Please stand by. The time is 8:09 a.m. New York time and we're going off the record.

(Brief recess taken.)

THE VIDEOGRAPHER: Stand by. The time is 8:25 a.m. New York time and we're back on record.

Q Mr. Volkers, do you have in front of you Exhibit 3203, Page 4? It should be a North Channel Bank dividend credit advice from May 14th of 2014.

A I have one regarding Vanderlee and Coloplast shares.

Q Great. We're on the same -- we're on the same page.

And does this state that Vanderlee Technologies Pension Plan received a dividend of 411,511 Euros and 64 cents on 7,700 shares of Coloplast, from which 111,108 Euros and 14 cents was withheld as tax, resulting in a payment of 300,403 Euros and 50 cents?

A It does, except for the fact that it is not 7,700 shares, but 770,000 shares.

Q Pardon me. Thank you for that

correction.

Did NCB search its records for evidence of the Vanderlee Technologies Pension Plan's purchase of Coloplast shares in May of 2014?

A Yes, we did.

Q Did NCB, in fact, hold 770,000 shares of Coloplast on behalf of the Vanderlee Technologies Pension Plan?

MS. RICE: Objection.

A The bank did not at any time hold Coloplast shares and not for Vanderlee, either.

Q And did NCB search its records for evidence of the receipt of any dividend income in connection with the Vanderlee Technologies Pension Plan's purchase of Coloplast shares in 2014 -- in May of 2014?

A Yes, we did.

Q Did NCB, in fact, receive dividend income on Coloplast shares in May of 2014?

MS. RICE: Objection.

A No, we did not.

Q Is this dividend credit advice true or false?

MS. RICE: Objection.
A It is false.
Q So just -- I think that's the end of all 11 dividend credit advices.
But just so we have a very clear record, did NCB hold the shares identified on the dividend credit advices we looked at in Exhibit 3202 that's relating to Omineca?
MR. BAHNSEN: Objection.
A The bank did not hold any of these shares.
Q Did NCB receive any dividends in connection with the shares identified in the dividend credit advices in Exhibit 3202?
A No.
Q Turning back just quickly to Exhibit 3203, the -- all the shares identified in the dividend credit advices -- did NCB hold the shares identified in the dividend credit advices contained within Exhibit 3203, which is Tab 4 of your binder?
MS. RICE: Objection.
A We did not receive any dividends.
Q My question was -- I was about to ask that question, but I was asking about

shares. So let me just be clear.

Did NCB hold the shares identified in the dividend credit advices in Exhibit 3203?

MS. RICE: Objection.

A The bank did not hold any shares as described in the credit advices, and thus not any dividends either.

Q Okay. That's good. Thank you.

Can I ask you to turn to Tab 5 of your binder, 3204?

MR. OXFORD: Mark 3204.

(Whereupon the above mentioned was marked for Identification.)

Q On the first page of which is an e-mail from Sam Redell, R-E-D-E-L-L, to you amongst others.

Can you tell me, please, who Mr. Redell is?

A Sam Redell is a member of the management group, the operations manager, and is also in charge of all settlement from our treasury and trading department.

Q Did Mr. Redell perform a search of NCB's books and records at your direction?

long and short Danske Bank positions on this Excel spreadsheet --

A Then there are no shares.

Q And is that the reason that -- is that one of the reasons you testified earlier that these statements on the dividend credit advices, the share holdings by these two plans, were false?

A That's correct.

Q Just then focusing on Column F, the "Credit Amount," ignoring the bottom German security on here, Dinler, which is a German share, for any individual security, is it correct to say that the amount of dividend-related credits and debits, Column F, net to zero?

A It's correct.

Q So back to Column F, Row 74.

Does this purport to show that the Omineca plan received credit of 348,677 Euros and 97 cents related to its 550,000 shares of Pandora?

A Let me put it this way. If it weren't fictitious shares, this would have been the case. But there were no shares,

they were fictitious.

Therefore, there has not been any real money credited to the account.

Q And if we were to then add up all of the credits and debits -- withdrawn.

If you add up all the March 25, 2014 credits and debits related to Pandora shares on Column F, the amount sums to .01 Euros.

Correct?

A Yes. It was apparently a rounding.

Q It's not the case that NCB actually received 1 cent relating to this Pandora --

A I suspect that they're surrounding it in the spreadsheet.

Q And then, just one more example.

Row 104, does Column F purport to show that the Vanderlee Technologies Pension Plan received a credit of 955,000 -- excuse me -- 802 Euros and 76 cents related to its 4.9 million shares of Danske Bank?

A It's an analogy of what we just said. There have not been any real shares and there has not been any real dividend payment. So it would not exist.

A Yes.
Q Can you describe for us what this is?
A Well, it's the transcript of the Gloucester Court court book from September 23rd in 2019. I represented the bank in a criminal case that was negotiated in front of the judge, where it was the Prosecutor Office against the bank.
The bank was charged for serious -- for collusive serious fraud against the Danish state. And we accepted that, and they pleaded guilty on behalf of the bank.
Q And does the -- does Exhibit 3205 accurately reflect the facts of the fraud to which you pleaded guilty on behalf of NCB?
MR. BAHNSEN: Objection to form.
A It's reflected in headlines, I would say. Because it doesn't really go very deep into what motivated us. But the setup of the business was extremely unusual.
We knew already that in Germany, since 2012, cum ex was strongly prohibited. And that, of course, makes it a little bit more cautious at what has been done here.

course, increased our interest in what was going on here.

So the bank then did get monies, but they actually also -- and that was criticized by the regulator, indeed -- they also gave credits, facilities to some of the plans, not all. And so it was prefinanced until the monies that finally were received came in. And that's the breaking point.

The monies -- the only monies we saw coming in were amounts from the tax reclaim agency in London. That was real money coming in. This could cover the credits, this could cover also the fees that the bank claimed from the pension plans.

And that led to the conclusion that the dividend credit advices were produced only for one single reason, to show amounts deducted from the gross dividend as withholding tax to be presented via the tax reclaim agencies to Danish and also Belgian tax authorities, and under the double tax treaty regulation to reclaim taxes paid.

Since there have not been any dividends, there have not been any taxes

paid, there was no reason for reclaiming anything. We were convinced that this is fraud and that the bank was deeply involved in the setup of a fraudulent business.

MR. BAHNSEN: Objection to the narrative.

Q Did the collusive serious fraud against the Danish state that you described include false reclaims made on behalf of the Omineca Pension Plan?

MR. BAHNSEN: Object to form.

A Yes.

Q And did the collusive serious fraud against the Danish state include false reclaims made on behalf of the Vanderlee Technologies Pension Plan?

MS. RICE: Objection.

A Yes.

MR. OXFORD: Let's go off the record.

THE VIDEOGRAPHER: Stand by. The time is 9:23 a.m. New York time and we're going off the record.

(Whereupon a discussion was held off the record.)

(Brief recess taken.)

THE VIDEOGRAPHER: Stand by. The time is 9:42 a.m. New York time and we're back on record.

Q Mr. Volkers, I think you have a KPMG report, which is Exhibit 3206 in your binder. It's Tab 6. I'm sorry. It's Tab 7.

But I think you have it? Do you?

A Yeah.

Q Okay. And can I ask you to find at -- towards the back of it, there's an Annex 2.2. And it appears the Bates numbers will help you find it. It's at 0 -- it starts at 0139.

Are you familiar with the slides here at Annex 2.2 of the KPMG report?

A Yes, I am. This is a Vizio presentation made by one of the employees, Daniella Menso, in order to visualize the business procedures that were to be set up and that in part also were set up.

It shows, actually in a very nice way, how the transactions and all steps are to be done. So it's visualized, it' -- it gives an easy overview of the setup. And

having in mind what I said before, you can easily recap that the whole setup only works because all parties involved are customers at the bank, which makes it possible only to enter bookings, not on -- based on real transactions, and to book across the different accounts no matter what kind of security, no matter even for -- for pledged monies. They are also in book money. Then you will see they always end up in a zero.

And this is a clearly circular setup. This is intended and this works only because all parties involved agree on how this has to be done.

MR. BAHNSEN: Objection.

A And this includes persons from -- well-known external persons known by the shareholders. They have, as to, as far as I know, also a clear relationship to Solo Capital, and the cum ex that has been done out of there.

So this setup is then being refined and put into a German setup with the DWP Bank. The overall setup, then, looks as you see it here, and it has all been established