# Exhibit 5, Part 3

*B.    Awareness and review of Solo Trading*

4.155.   TJM was aware of the trade sizes it purportedly executed on behalf of the Solo Clients across the Relevant Period, as the total trading volume was made available to the Firm's senior management on a daily basis through internal communications and spreadsheets used by TJM to calculate its commission.

4.156.   Once the Solo Trading commenced, TJM did not undertake a review of the sizes and volumes of the transactions executed to ensure the level of trading was consistent with their understanding of the Solo Clients' risk profile. As a result, TJM failed to consider a number of key facts relevant to on-going monitoring and financial crime risk. These included but were not limited to the total sizes that were being traded, the amount of shares outstanding in the relevant stocks and any applicable disclosure thresholds for major shareholders (which, had TJM done so, would have indicated that the volumes of Solo Trading were implausible).

4.157.   On 18 March 2014, almost a month after the Solo Trading had commenced, an internal TJM email provided an update with regards to the trades for the day, which stated:

Employee 1: "*What was the nominal value?*"

Employee 2: "*£2.9billion today*"

Employee 1: "*Crickey …*"

Employee 2: "*Apparently this is just the start. Going to be more by the end of May!*"

4.158.   On the same day, an email followed from TJM's senior management to the wider team at TJM stating "… we have had another sterling performance today on the Solo account and another Firm record broken".

4.159.   On 26 February and 31 March 2014, TJM executed Cum-Dividend Trading to the value of approximately £518 million  on behalf of a Solo Client that had been incorporated on 30 January 2014 and whose UBO had worked at Solo Group until January 2014. A TJM staff member acknowledged that these trades were "*massively big*" and would "*certainly require further explanations*". However,

there is no evidence showing any follow-up enquiries were actually made, nor that TJM conducted any additional monitoring in respect of the Solo Client.

4.160.  This early indication of the high volume of trading ought to have prompted TJM to consider financial crime risk and review whether the trading was in line with the Solo Clients' profile, whether the Solo Clients had sufficient funds to settle the trades, and whether the trade sizes affected their risk profiles.

4.161.  Minutes of a TJM "Compliance Meeting" dated 25 March 2014 suggest that TJM had further discussions about the Solo Group business where they appear to have reviewed this business as a result of a few "areas of uncertainty"; including transaction reporting, legality, AML and other concerns.

4.162.  On 26 March 2014, TJM met with another of the Broker Firms "to examine, on an informal basis", the respective relationships between TJM, the Broker Firm and the Solo Group, and also the trading process to date. One of the questions raised by TJM was "*regarding the size and purpose of trades executed in mainly Danish cash equities over the past 30 days*".

4.163.  TJM therefore had sufficient concerns to warrant external discussions with the other Broker Firm to examine their relationships and trading process with the Solo Group. However, it failed to implement adequate measures and adapt its approach as a result of these concerns, including undertaking a risk assessment or further monitoring or due diligence in respect of each Solo Client.

4.164.  Instead, TJM proceeded on the assumption that the Solo Clients would be trading in sizes wholly in excess of their relevant disclosed capital as part of a complex series of transactions and that the Solo Clients had sourced sufficient funds to conduct such trading from elsewhere.  TJM, however, did not make any enquiries or request any further information as to the source of funds of the Solo Clients which would enable them to conduct such trading.

4.165.  By way of example, on 19 March 2015, TJM received and executed a buy order to the value of approximately £208 million in 'Stock C' on behalf of one of the 401(k) Pension Plans ("Client A") owned by the college student mentioned at paragraph 4.86 above. Of note:

  a)  Full liquidity was sourced on Brokermesh within seven minutes;

b) The volume of shares executed by TJM on behalf of Client A represented 142% of the volume of shares in 'Stock C' that was traded on European exchanges by all other market participants on that day; and

c) On the same day, TJM executed further 'buy' orders in 'Stock C' on behalf of 47 other Solo Clients to the value of approximately £10.2 billion. The shares of Stock C traded by TJM represented 14.5% of the total shares outstanding.

4.166.  TJM did not query how it was possible to find sufficient liquidity within a closed network of clients and whether it was realistic that (i) a college student had the funds to execute a trade that amounted to more than the entire day's volume of trading in Stock C across all European exchanges; nor (ii) how the Solo Clients (which were mostly individual US 401(K) pension plans) had funds to trade in such large amounts.

4.167.  Instead, TJM stated that it took comfort that there were other counterparties involved in similar business and relied upon their view of the reputation of people behind the Solo Group. TJM claimed that they only had visibility of a small part of a larger number of complex trades as executing broker, which would all have been subject to the Solo Group's approval. As a result, TJM failed to recognise the obvious financial crime risks associated with the Solo Trading, and, consequently, the risk that it might be used to further money laundering.

4.168.  All regulated firms (including execution-only brokers) must consider and mitigate the risk that they could be used to facilitate financial crime, even if client monies do not flow directly through the firm. The Authority has published considerable guidance on managing the risk of financial crime, particularly in its Financial Crime Guide, which was first published in December 2011 and which TJM ought to have been aware of.

*The Ganymede Trades*

4.169.  Firms must have adequate policies and procedures, systems and controls which provide for the identification, scrutiny and reporting of complex or large transactions; unusual patterns of transactions which have no apparent economic or visible lawful purpose; and any other activity which may be related to money laundering. Firms are required to monitor customer transactions to assess risk and ensure that they are not being used for the purpose of financial crime.

*Ganymede Trade 1*

4.170.   On 16 June 2014 Clients D, E and F sent onboarding requests to TJM, two of which the Solo Group advised as an "urgent onboarding". They were onboarded between 17 and 20 June 2014.  They all had a single UBO, who was a previous Solo Group employee.  Two of them were newly incorporated in the BVI in June 2014 and one in the Cayman Islands in February 2014.

4.171.   On 30 June 2014, a TJM staff member received a call from a Solo Group representative, on his mobile phone, advising that TJM would receive emails from a new group of clients seeking liquidity in a particular stock. The TJM staff member was instructed by the Solo Group to seek this from a specific client.  Later that same day, TJM executed three buy orders on behalf of three Solo Clients ("Clients D, E and F"), each owned by associates of Sanjay Shah, in a German stock ("German stock A") at a specified price of EUR 160.12 (to the value of EUR 440.8 million). Each trade was executed with Ganymede, which was owned by Sanjay Shah. Shortly afterwards, TJM then executed a 'buy' order on behalf of Ganymede in the same German stock for the same quantity at a higher price of EUR 160.98 to the value EUR 443.2 million, which were all sourced from the same three Solo Clients, that is Clients D, E and F.

4.172.   Together, these circular trades ("Ganymede Trade 1") resulted in Ganymede making a loss of EUR 2.4 million to the benefit of Clients D, E and F. Ganymede Trade 1 had no apparent economic purpose except to transfer funds from Sanjay Shah to his associates.

4.173.   A chronology relating to Ganymede Trade 1 can be found at Annex D1. During the Relevant Period, TJM did not execute any other trades on behalf of Clients D, E and F.

4.174.   Ganymede Trade 1 was escalated to TJM's management on or around 3 July 2014 as some TJM staff had "major concerns" regarding these trades. As a result, TJM requested an explanation from the Solo Group as the custodian of Ganymede Trade 1, rather than approaching the clients directly. On 10 July 2014, the Solo Group provided information "indicating the validity of the trades which Solo have approved as custodian" and explained to TJM that these transactions "*had been*

48

*internally evaluated and approved*" and reflected the clients' desire to "*move value*" from one entity to others.

4.175.   On 14 July 2014, TJM asked for its Compliance Consultant's opinion on Ganymede Trade 1. The Compliance Consultant suggested that the way forward is to produce a full report if they consider it is a suspicious transaction and keep evidence that the firm had identified and assessed the suspicious trades.

4.176.   Minutes of a TJM "Compliance / Traders" meeting dated 16 July 2014 suggest two separate issues were discussed:

a)   "*Did TJM act correctly or did it breach any FCA rules or other laws? Were we acting within our scope of permission?*"

b)   "*Were the trades themselves compliant or are the clients involved in market abuse or acting improperly or illegally?*"

4.177.   The following unusual circumstances were also noted from those minutes:

a)   TJM staff communicated with Solo Group via their personal mobile phone about the client onboarding and liquidity seeking;

b)   Solo Group alerted TJM to clients' onboarding requests and orders before they were made;

c)   Solo Group instructed TJM to seek liquidity specifically from Ganymede rather than going to market or seeking it from a pool of clients;

d)   It was the first time give up trades had been carried out between two clients when normally they are carried out between one client and a broker;

e)   Previous Solo Trading was carried out as 'market-on-close' (end of day price) but these were limit orders (at market);

f)   Liquidity was matched within an hour despite a trade size of EUR 440 million, which was noted by TJM in the minutes, as being "*very hard to fill*";

g)   The trade was reversed within the same group of clients at a different price shortly after, at a loss of approximately EUR 2 million to Ganymede;

49

h) Only on this occasion, the trade was not booked on Brokermesh platform; and

i) This was the first time the trades were closed on the same day, whereas usually the Solo Clients had positions open for weeks or months.

4.178. TJM further stated that they did not fully understand how the trade worked and acknowledged that it appeared to be a departure from the usual Solo Trading.

4.179. On 18 July 2014, TJM's Compliance Consultant produced a report in particular to address the issues mentioned at paragraph 4.177, which set out that Ganymede Trade 1 only appeared suspicious to TJM because they were only seeing one aspect of the complicated trading, which the Solo Group described as a "book squaring exercise".

4.180. The Compliance Consultant concluded that a constant review of this activity from the Solo Group and associated clients be maintained and another investigation should take place if concerning trading occurred again. However, the Authority notes the Compliance Consultant's report contradicted itself, by both (a) noting that Clients D, E, F and C could not predict how the market would move when they entered into Ganymede Trade 1; and (b) accepting the Solo Group explanation provided for Ganymede Trade 1, which implies the activity was pre-determined in relation to the direction and size of intended profits, and designed losses to ensure the trade would move "value from one entity to its correct destination";

4.181. TJM did not appear to have considered requesting documents or information to support the Solo Group's explanation of the Ganymede Trade 1, or what the Solo Group's role in the trade might have been.

4.182. Further, TJM had not identified or considered:

a) Whether, given doubts from staff over the plausibility of Clients D, E and F or Ganymede sourcing such sizeable liquidity in such short order, Ganymede Trade 1 was in line with the trading volumes which could be expected from these clients, given the limited information previously obtained through CDD;

    b)    Whether this liquidity was plausible in the market, given that the volume of shares of German stock A purportedly executed by TJM in Ganymede Trade 2 represented 3.17 times the volume of shares traded on European exchanges in that security by all other market participants on that day;

    c)    Notwithstanding the issues with the Solo Group's explanation, why Solo Group staff would be involved in directing how clients' orders were filled, or what implication this could have regarding the reliability of the Solo Group as a source of information in relation to Ganymede Trade 1.

4.183.    Instead, TJM appears to have relied solely on a statement provided by the Solo Group that "*these deals had been evaluated internally and approved*". Despite having concerns as to whether Ganymede Trade 1 was pre-arranged and may have had AML and/or market abuse implications, TJM did not follow up on these concerns, rather, it noted "One *big area of comfort is that Solo are fully aware of all aspects of the transaction*".

*Ganymede Trade 2*

4.184.    On 29 January 2014, Clients G, H and I sent onboarding requests to TJM and they were onboarded between 26 and 28 March 2014. They all had a single UBO and were incorporated in the BVI in September 2013.

4.185.    On 23 October 2014, TJM executed three buy orders on behalf of these three Solo Clients ("Clients G, H and I"), each owned by further associates of Sanjay Shah, in the same German stock A as Ganymede Trade 1 at a specified price of EUR 147.05 to the value of EUR 170.0 million, which were all sourced from Ganymede. Shortly afterwards, TJM then executed a buy order on behalf of Ganymede in German stock A at a higher price of EUR 149.06 to the value of EUR 172.3 million, which were all sourced from the same three Solo Clients, that is Clients G, H and I.

4.186.    Together, these circular trades ("Ganymede Trade 2"), in a similar fashion to Ganymede Trade 1, resulted in Ganymede making another loss of EUR 2.3 million to the benefit of Clients G, H and I. Again, Ganymede Trade 2, had no apparent economic purpose except to transfer funds from Sanjay Shah to his associates.

4.187.  A chronology relating to Ganymede Trade 2 can be found at Annex D2. Prior to Ganymede Trade 2, TJM had purportedly executed the Solo Trading (eight 'sell' orders in Belgian equities) on behalf of Clients G, H and I between 17 April 2014 and 2 May 2014 to the aggregate value of approximately £2.03 billion.

4.188.  On 23 October 2014, TJM staff identified numerous unusual circumstances about Ganymede Trade 2 prior to executing the second part of the trades (which occurred later on the same day):

   a)   Ganymede Trade 2 was conducted in a similar manner to Ganymede Trade 1;

   b)   The initial sale of German shares by Ganymede at EUR 147.05 was "inside the daily trading range but 3 Euros away from the prevailing market price, (rather than the close)";

   c)   Ganymede Trade 2 involved a total volume of 1,156,062 shares in a context where the "average daily volume for this stock is 700,000", and with only "352,000 shares having been traded" on exchange, on the day the trade occurred;

   d)   Ganymede Trade 2 was carried out between Solo Clients, rather than trading through another regulated entity. All three of Clients G, H and I had their full orders settled by just one counterparty, Ganymede;

   e)   TJM staff noted: "Similar to last time the trades are being unwound today (no doubt at a different price) rather than letting them run the course"; and

   f)   Ganymede, identified as Sanjay Shah's company, "*incurred over €2.3m loss*", to the gain of Clients G, H and I.

4.189.  Minutes of a TJM "Compliance / Management" meeting, dated 13 November 2014, described Ganymede Trade 2 as a "major topic" on the meeting agenda, where the above points at paragraph 4.188 were reiterated.

4.190.  At the meeting TJM appeared to reach the conclusion that "These transactions appear *at face value to be unusual and require an explanation.*" and a staff member would therefore speak to a Solo Group representative "*about a number of issues pop the question in so as not to arose any suspicion*".

52

4.191. TJM stated that it considered Ganymede Trade 2 was not the "normal trading pattern of Solo business and it was unusual". In that respect, it had concerns that Ganymede Trade 2 may have constituted a potential "breach" and was concerned not to tip-off the Solo Group and ultimately Sanjay Shah, who was also the owner of Ganymede.

4.192. On 25 November 2014, a TJM staff member met with a Solo Group representative to discuss the matter but stated they were unable to recall the outcome of this meeting. There is no record of that discussion, or of what explanation (if any) was provided by the Solo Group in relation to Ganymede Trade 2.

4.193. Minutes of a further TJM "Compliance / *Management*" meeting dated 3 December 2014 which was focused on Ganymede Trade 2 recorded that:

   a) TJM concluded that "*on the face of it are unlikely to involve market abuse and there appears to be no suggestion of criminal activity as some the parties are connected with Solo*".

   b) TJM further concluded that there was no evidence of money laundering as those behind the trades were connected with the Solo Group.

   c) TJM assumed that the Solo Group, who would oversee all of the trading activity, would carry out the settlement of Ganymede Trade 2.

   d) No explanation was recorded as being provided to TJM by the Solo Group in relation to Ganymede Trade 2.

4.194. In Ganymede Trade 1 and 2, TJM failed to identify or consider:

   a) How Clients G, H and I or Ganymede would have been able to source such sizeable liquidity in such short order (in light of the limited market liquidity identified by TJM staff), and whether this was in line with the trading levels which could be expected from these clients, given the information previously obtained through CDD;

   b) Whether the liquidity was plausible in the market, given that the volume of shares of German stock A purportedly executed by TJM in Ganymede Trade 1 and 2 represented 3.17 times and 1.12 times the volume of shares traded

on European exchanges in that security by all other market participants on the respective days;

c)   TJM appears to have relied solely on a statement provided by the Solo Group that "*these deals had been evaluated internally and approved*" and reflected the clients' desire to "*move value*" from one entity to others. Despite having concerns as to whether Ganymede Trade 1 was pre-arranged and may have had AML and/or market abuse implications, TJM did not follow up on these concerns nor requesting documents or information to support the Solo Group's explanation, rather, it merely noted "*One big area of comfort is that Solo are fully aware of all aspects of the transaction*".

d)   Similarly, the correspondence surrounding Ganymede Trade 2 exhibited numerous indicators of a predetermined set of transactions with no economic purpose, which was highly indicative of potential financial crime. For example:

   i.   Solo pre-alerted and instructed TJM to seek liquidity specifically from Ganymede and within 13 minutes three separate clients contacted TJM seeking liquidity for large volumes without mentioning prices;

   ii.   It is unusual that liquidity was matched for such a large volume of shares (1,156,062) within just 37 minutes;

   iii.   Within seven minutes, three separate clients offered the same purchase price of EUR 147.05;

   iv.   Just one hour after Ganymede had sold the shares, it offered to reverse the positions to buy back all the shares at a higher price of EUR 149.06; and

   v.   Within a further nine minutes the same group of clients agreed to sell back the shares back.

e)   While TJM believed Ganymede Trade 2 was prearranged this remained irreconcilable with Ganymede's explanation for requesting to buy back the German stock it had sold, purportedly because it is "*worried about the exposure on the trade now*";

54

f) Notwithstanding the issues with Solo Group's explanation, TJM did not consider why Solo Group staff would be involved in directing how clients' orders were filled or what implication this might have regarding the reliability of Solo Group as a source of information, or a source of comfort regarding the potential money laundering risks;

g) TJM informed the Authority that they had not considered money laundering concerns to be their responsibility as an execution only broker, which did not process the settlement of cash or shares, rather, they viewed this as the responsibility of the Solo Group; and

h) Despite TJM's Compliance Consultant's advice on 18 July 2014 to undertake further investigation if concerning trading occurred again, no such investigation or steps appear to have been taken.

4.195. TJM was unable to explain to the Authority how it concluded at the 3 December 2014 meeting that all of its concerns on Ganymede Trade 2 had been addressed. Significantly, TJM was unable to explain how it reached these conclusions in spite of its initial concerns on 13 November 2014 regarding the suspicious nature of Ganymede Trade 2 and without making any further enquiries to the Solo Group or seeking an explanation from the clients directly.

*Ganymede Trade 3*

4.196. On 16 July 2015, TJM declined to execute a trade in a German stock ("German stock B") between a new client Client J as the buyer, which the Firm believed was not connected to the Solo Group and Client L as the seller. TJM understood that Client L was owned by a relative of Sanjay Shah and had ties to the issuer of German stock B.

4.197. On 18 August 2015, TJM declined to execute another trade in German stock B between Client J as the seller and Client L as the buyer.

4.198. TJM staff identified a number of unusual circumstances in these two declined trades ("Ganymede Trade 3") in particular that, Client J had recently bought shares in German stock B from Client L and was looking to sell back to Client L within approximately a month, therefore making the economic purpose of the trades unclear.

4.199.  On 18 August 2015, TJM informed Solo Group that it felt uncomfortable to proceed as a result of (i) the direction of the trade and its timing following the first declined leg; and (ii) the relationships involved between Clients J and K, Solo Group, Sanjay Shah and the issuer of Ganymede stock B.

4.200.  Distinguishing Ganymede Trade 3 from Ganymede Trades 1 and 2, TJM explained the key difference in approach had been the opportunity to review the information they had and to reject the trade prior to its execution; that is TJM may have rejected Ganymede Trades 1 and 2 had the opportunity presented itself in time, but it didn't. However, given there was a time gap of some four months between Ganymede Trade 1 and 2, TJM had had ample time and opportunities to consider the similar circumstances in executing or declining Ganymede Trade 2.

Reliance on external compliance consultant

4.201.  On three occasions during the Relevant Period, TJM sought and received compliance advice from an external compliance consultant: in March 2014 regarding "dividend washing trading", in July 2014 concerning first Ganymede Trade, and in March 2015 regarding client onboarding processes. However, the scope of the consultant's engagement on each occasion was very narrow, with limited information provided by TJM. The external consultant's invoices charged only three hours on each of the first two occasions and eight hours on the third occasion. The compliance consultant described their oversight as "*just dipping into it in the very tiniest lightest look, there wasn't any deep dives [sic], we didn't see any of the detailed transactions, what was going through*", and business size was not mentioned.

**End of the Purported Solo Trading and Payment**

4.202.  TJM executed its last purported trade for a Solo Client on 28 September 2015.

4.203.  On 29 October 2015, TJM was contacted by a Solo Group representative via telephone and 'WhatsApp' to present an unsolicited initial offer for a company in the name of Elysium Global (Dubai) Limited ("Elysium") to purchase 95% of outstanding debts owed to TJM by the Solo Group by the Solo Clients.

4.204.  TJM has explained to the Authority that this debt factoring facility offer came "*out of the blue*" and it had not previously heard of Elysium.

56

4.205.  Following the initial contact, TJM carried out due diligence on Elysium which was limited to internet searches and searches via 'CreditSafe'. During this process, TJM became aware that Sanjay Shah was a board member of Elysium which was wholly owned by Elysium Global Limited, a UK company.

4.206.  Internal email correspondence within TJM on 29 October 2015 suggests that one member of staff queried the reason for the debt factoring offer and stated:

> "I am rather shocked! Why have they made this offer? Was this their idea or ours?
>
> I am in two minds about this: Part of me is thinking it is better to take money now, than risk getting nothing in the future! (what guarantee is there that they will pay?)
>
> And then this could be seen be seen as a further reduction of income from their business (or increased charges) from last year!"

4.207.  On 2 November 2015, Elysium contacted TJM to provide *"official confirmation"* that it wanted to extend a debt factoring facility against TJM's trading debtors. TJM then requested a contract and a list of the debts Elysium wanted to buy. Further internal email correspondences at TJM stated:

> *"Very strange. Happy either way re factoring... Let's just make sure things are airtight from our perspective."*

4.208.  Later that day, TJM was notified by the Solo Group that it was "closing down" and no longer offering the Solo Trading.  This information had not been announced publicly.

4.209.  On 3 and 4 November 2015, the Authority made unannounced visits to the offices of TJM, the Solo Group entities and the other Broker Firms, which is when the Firm became aware of wider concerns regarding the Solo Group business. Prior to the visit, the Firm was alerted by press articles to concerns regarding the Solo Group which it did not follow up on.

4.210.  Although TJM was keen to finalise a debt factoring agreement with Elysium prior to any payment, and despite asking on several occasions, ultimately the documentation *"was not forthcoming"*.

4.211.  On 4 November 2015, TJM responded to an *"official confirmation"* email from Elysium and stated:

    *"In lieu of receiving the documentation as discussed, can you arrange a transfer for the funds you would like to purchase from us… I will send through copies of the invoices for your records separately… Our bank details for USD payments are as follows…"*

4.212.  On 6 November 2015, Elysium asked TJM to confirm the payment amount of USD 117,971, which was agreed, and attached an International Wire Transfer Confirmation.

4.213.  Later that day TJM had not received the payment and had concerns as to whether and/or when they would receive the payment from Elysium. A member of staff commented that "it reminds me of the Nigerian email scams". This comment reveals that without resolving its concerns, TJM accepted this highly suspicious payment.

4.214.  On 25 November 2015, TJM eventually received payment of USD 117,960 from Elysium (the "Elysium Payment") although it still had not received any formal agreement with Elysium.

4.215.  Despite internal comments regarding the Elysium Payment, TJM has informed the Authority that the transaction "*did not of itself give rise to any concerns*". Indeed, the Firm admitted that their only concern at the time was whether or not they would be paid commission owed by the Solo Clients."

4.216.  TJM therefore did not consider associated financial crime and money laundering risks posed to the Firm in relation to the Elysium Payment. This was in spite of the fact that TJM was aware Sanjay Shah was a board member of Elysium and the Authority had conducted an unannounced visit alerting TJM to possible issues with the Solo Group days before TJM accepted the Elysium Payment.

4.217.  The circumstances by which TJM was presented with a debt factoring offer for a company it had not heard of before, which was an entity based in the UAE with no assumed regulatory equivalence, together with the Firm's acceptance of the offer and receipt of funds without any agreement in place, is striking and suggests that TJM failed to adequately consider associated financial crime and money

laundering risks. This is particularly concerning as 'cross border transactions' and 'products with reduced paper trails' are specifically listed in the JMLSG guidance as factors that will generally increase the risk of money laundering for invoice finance products.

**Failure to identify and escalate above issues**

4.218.   TJM failed to identify and escalate any of the above issues.  With respect to anti-money laundering and financial crime risk during the Relevant Period, TJM did not identify any transactions raising any suspicions and no breaches were reported or observed.

## 5.  FAILINGS

5.1.   The statutory and regulatory provisions relevant to this Warning Notice are referred to in Annex B.

5.2.   The JMLSG Guidance has also been included in Annex B, because in determining whether breaches of its rules on systems and controls against money laundering have occurred, and in determining whether to take action for a financial penalty or censure in respect of a breach of those rules, the Authority has also had regard to whether TJM followed the JMLSG Guidance.

**Principle 3**

5.3.   Principle 3 requires a firm to take reasonable care to organise and control its affairs responsibly and effectively, with adequate risk management systems.

5.4.   The breaches revealed serious or systemic weaknesses in both the Firm's procedures and the management systems or internal controls relating to the Firm's governance of financial crime risk.

5.5.   TJM breached this requirement during the Relevant Period in relation to the Solo Clients and the purported Solo Trading, Ganymede Trades and the Elysium Payment, as its policies and procedures were inadequate for identifying, assessing and mitigating the risk of financial crime as TJM failed to:

59

a) Provide adequate guidance on when and how to conduct risk assessments of new clients and what factors to consider in order to determine the appropriate level of CDD to be applied to clients;

b) Set out adequate processes and procedures for CDD, including in relation to obtaining and assessing information when onboarding new clients;

c) Set out adequate processes and procedures detailing when and how to conduct EDD;

d) Design and implement any effective process and procedures for ongoing monitoring, including when and how transactions were to be monitored, with what frequency and in relation to record keeping; and

e) Set out processes and procedures for identifying, managing, escalating and documenting financial crime and AML risks.

**Principle 2**

5.6.    The Authority also considers that TJM failed to act with due skill, care and diligence as required by Principle 2 in assessing, monitoring and managing the risk of financial crime associated with the Solo Clients and the purported Solo Trading, Ganymede Trades and Elysium Payment, in that the Firm failed to:

a) Conduct appropriate customer due diligence, by failing to follow even its own limited CDD procedures;

b) Gather adequate information when onboarding the Solo Clients to enable it to understand the business that the customers were going to undertake, including the likely size and frequency of the intended trading;

c) Conduct risk assessments for any of the Solo Clients;

d) Complete EDD for any of the Solo Clients despite numerous risk factors being present which ought to have made it clear to the Firm that EDD was required;

e) Assess each of the Solo Clients against the categorisation criteria set out in COBS 3.5.2R and failed to record the results of such assessments, including sufficient information to support the categorisation, contrary to COBS 3.8.2R(2)(a);

60

f) Conduct ongoing monitoring, including any monitoring of the Solo Trading and Ganymede Trades;

g) Recognise numerous red flags with the Solo Trading. These included failing to consider whether it was plausible and/or realistic that sufficient liquidity was sourced within a closed network of entities for the high volumes of trading conducted by the Solo Clients.  Likewise, TJM failed to consider or recognise that the profiles of the Solo Clients meant that they were highly unlikely to be capable of the volume of the trading purportedly being carried out, and made no attempts to at least obtain sufficient evidence of the clients' source of funds to satisfy itself to the contrary;

h) Recognise numerous red flags arising from the purported Ganymede Trades and adequately consider the serious financial crime and money laundering risks they posed to the Firm; and

i) Adequately consider associated financial crime and money laundering risks posed by the Elysium Payment after employees questioned several red flags regarding the payment, and shortly after the Authority had conducted an unannounced visit alerting TJM relating to possible issues with the Solo Group.

## 6. SANCTION

6.1.    The Authority has considered the disciplinary and other options available to it and has concluded that a financial penalty is the appropriate sanction in the circumstances of this particular case.

6.2.    The Authority's policy on the imposition of financial penalties is set out in Chapter 6 of DEPP. In determining the financial penalty, the Authority has had regard to this guidance.

6.3.    DEPP 6.5A sets out a five-step framework to determine the appropriate level of financial penalty.

**Step 1: disgorgement**

6.4.    Pursuant to DEPP 6.5A.1G, at Step 1 the Authority seeks to deprive a firm of the financial benefit derived directly from the breach where it is practicable to quantify.

61

6.5.    The financial benefit associated with TJM's failings is quantifiable by reference to the revenue it received and derived from the Solo business as described in the Notice was £1,334,143 minus the custodian fees paid of £135,865.

6.6.    The figure after Step 1 is therefore **£1,198,277**.

**Step 2: the seriousness of the breach**

6.7.    Pursuant to DEPP 6.5A.2G, at Step 2 the Authority determines a figure that reflects the seriousness of the breach. Where the amount of revenue generated by a firm from a particular product line or business area is indicative of the harm or potential harm that its breach may cause, that figure will be based on a percentage of the Firm's revenue from the relevant products or business area.

6.8.    The Authority considers that the revenue generated by TJM is indicative of the harm or potential harm caused by its breach. The Authority has therefore determined a figure based on a percentage of TJM's relevant revenue during the period of the breach.

6.9.    TJM's relevant revenue is the revenue received and derived from the purported Solo Trading and the Ganymede Trades, less the related custodian fees paid. The period of TJM's breach was from 29 January 2014 to 25 November 2015. The Authority considers TJM's relevant revenue for this period to be £1,334,143.

6.10.    In deciding on the percentage of the revenue that forms the basis of the step 2 figure, the Authority considers the seriousness of the breach and chooses a percentage between 0% and 20%. This range is divided into five fixed levels which represent, on a sliding scale, the seriousness of the breach; the more serious the breach, the higher the level. For penalties imposed on firms there are the following five levels:

Level 1 – 0%

Level 2 – 5%

Level 3 – 10%

Level 4 – 15%

Level 5 – 20%

62

6.11.    In assessing the seriousness level, the Authority takes into account various factors which reflect the impact and nature of the breach, and whether it was committed deliberately or recklessly. DEPP 6.5A.2G lists factors likely to be considered 'level 4 or 5 factors'. Of these, the Authority considers the following factors to be relevant:

1.    The breaches revealed serious or systemic weaknesses in the Firm's procedures and the management systems or internal controls relating to the Firm's governance of financial crime risk; and

2.    The breaches created a significant risk that financial crime would be facilitated, occasioned or otherwise occur.

6.12.    Taking all of these factors into account, the Authority considers the seriousness of the breach to be level 4 and so the Step 2 figure is 15% of £1,334,143.

6.13.    Step 2 is therefore **£200,121**

**Step 3: mitigating and aggravating factors**

6.14.    Pursuant to DEPP 6.5A.3G, at Step 3 the Authority may increase or decrease the amount of the financial penalty arrived at after Step 2, but not including any amount to be disgorged as set out in Step 1, to take into account factors which aggravate or mitigate the breach.

6.15.    The Authority considers that the following factor aggravates the breach:

1.    The Authority and the JMLSG Guidance have published numerous documents highlighting financial crime risks and the standards expected of firms when dealing with those risks. The most significant publications include the JMLSG Guidance and Financial Crime Guide (including the thematic reviews that are referred to therein) which was first published in December 2011. These publications set out good practice examples to assist firms, for example in managing and mitigating money laundering risk by (amongst other things) conducting appropriate customer due diligence, monitoring of customers' activity and guidance of dealing with higher-risk situations. Given the number and detailed nature of such publications, and past enforcement action taken by the Authority in respect of similar failings by other firms,

TJM should have been aware of the importance of appropriately assessing, managing and monitoring the risk that the Firm could be used for the purposes of financial crime.

2.    In addition, DEPP 6.5A.3G(2)(c) says: "where the firm's senior management were aware of the breach or of the potential for a breach, whether they took any steps to stop the breach, and when these steps were taken". The senior management of TJM were aware of the potential for breaches as it had concerns in relation to the Solo Business, Ganymede Trades and Elysium Payment but still continued to conduct these risky business activities, probably due to the Solo business represented approximately 41% of the Firm's revenue in during the Relevant Period.

6.16.    The Authority considers that there are no mitigating factors.

6.17.    Having taken into account these aggravating and mitigating factors, the Authority considers that the Step 2 figure should be increased by 20%.

6.18.    Step 3 is therefore **£240,145.**

**Step 4: adjustment for deterrence**

6.19.    Pursuant to DEPP 6.5A.4G, if the Authority considers the figure arrived at after Step 3 is insufficient to deter the firm who committed the breach, or others, from committing further or similar breaches, then the Authority may increase the penalty.

6.20.    The Authority considers that DEPP 6.5A.4G(1)(a) is relevant in this instance and has therefore determined that this is an appropriate case where an adjustment for deterrence is necessary.  Without an adjustment for deterrence, the financial penalty would be £240,145.  In the circumstances of this case, the Authority considers that a penalty of this size would not serve as a credible deterrent to TJM and would not meet the Authority's objective of credible deterrence.  As a result, it is necessary for the Authority to increase the penalty to achieve credible deterrence.

6.21.    Having taken into account the factor outlined in DEPP 6.5A.4G, the Authority considers that a multiplier of five should be applied at Step 4.

6.22.    Step 4 is therefore **£1,200,729**.

**Step 5: settlement discount**

6.23.    Pursuant to DEPP 6.5A.5G, if the Authority and the firm on whom a penalty is to be imposed agree the amount of the financial penalty and other terms, DEPP 6.7 provides that the amount of the financial penalty which might otherwise have been payable will be reduced to reflect the stage at which the Authority and the firm reached agreement. The settlement discount does not apply to the disgorgement of any benefit calculated at Step 1.

6.24.    The Authority and TJM did reach agreement to settle so a 30% discount applies to the Step 4 figure.

6.25.    The Authority has rounded down the final penalty to the nearest £100. Step 5 is therefore **£2,038,700**.

**Penalty**

6.26.    The Authority hereby imposes a financial penalty of £2,038,700 on TJM for breaching Principle 2 and Principle 3.

## 7.  PROCEDURAL MATTERS

7.1.    This Notice Is given to TJM in accordance with section 390 of the Act.   The following statutory rights are important.

**Decision maker**

7.2.    The decision which gave rise to the obligation to give this Notice was made by the Settlement Decision Makers.

**Manner of and time for payment of the financial penalty**

7.3.    The financial penalty must be admitted in the liquidation of the Firm by no later than 14 days from the date of the Final Notice.

7.4.    At this early stage of the liquidation process, there may be uncertainty surrounding the recovery of assets and adjudication of creditors' claims. Therefore, the Authority does not reduce the financial penalty to £nil in this case.

Instead, the financial penalty will be ranked with other creditors of the Firm but the Authority will keep it under review in order that legitimate creditors are satisfied prior to any funds realised in the liquidation being used to pay some, or all, of the financial penalty.

**Publicity**

7.5.    Sections 391(4), 391(6) and 391(7) of the Act apply to the publication of information about the matter to which this notice relates.  Under those provisions, the Authority must publish such information about the matter to which this notice relates as the Authority considers appropriate.  The information may be published in such manner as the Authority considers appropriate.  However, the Authority may not publish information if such publication would, in the opinion of the Authority, be unfair to you or prejudicial to the interests of consumers or detrimental to the stability of the UK financial system.

7.6.    The Authority intends to publish such information about the matter to which this Final Notice relates as it considers appropriate.

**Authority contacts**

7.7.    For more information concerning this matter generally, contact Giles Harry (direct line: 020 7066 8072 / giles.harry@fca.org.uk) or Denise Ip (direct line: 020 7066 0237 / denise.ip@fca.org.uk) of the Enforcement and Market Oversight Division of the Authority.

**Mario Theodosiou**
**Head of Department**
**Financial Conduct Authority, Enforcement and Market Oversight Division**

**Annex A: Chronology**
**The Solo Project**

| | |
|---|---|
| December 2013 | First meeting between TJM and SCP representatives about the Solo Project. |
| January 2014 | Initial discussions between TJM and SCP regarding proposed the business and commercial terms. |
| 24 February 2014 | TJM signed the SCP Services Agreement 2014. |
| 29 January 2014 | TJM received first on-boarding requests from Solo Clients custodied at SCP. |
| 26 February 2014 | TJM commenced Solo Trading. |
| 13 March 2014 | TJM Management, discuss cash flow problems at the firm and note that, without the Solo Group business, the firm is losing £20,000 - £25,000 per month.<br><br>TJM approach the Solo Group to discuss the potential to do further business, e.g. by introducing TJM clients to the Solo Group. Discussions result in a more detailed understanding of Solo's "*Yield Enhancement Strategy*". |
| 18 March 2014 | TJM Management congratulates employees for "*another firm record broken*", as TJM executes trades in Danish equities worth £2.9 billion on behalf of Solo Clients. |
| 25 March 2014 | TJM meet with its external Compliance Consultant to discuss "*Dividend Enhancement*", who subsequently provides written advice on 2 April 2014. |
| 26 March 2014 | TJM meets with one of the five Broker Firms to discuss "*the respective relationships of TJM and [the broker firm] with [SCP] and the trading process to date*". |
| By 31 May 2014 | TJM onboarded the first batch of 99 Solo Clients. |
| May to October 2014 | TJM set up a specific on-boarding process for Solo Clients. |
| By 31 October 2014 | TJM receives further onboarding requests from the second batch of further 34 Solo Clients. |
| 3 February 2015 | TJM signed the new Services Agreements with each of the Solo Group entities, agreeing to halved commission on trades. |
| 23 February 2015 | TJM Management concluded a "*proper review*" of numerous aspects of the TJM business with Solo Group is necessary. |
| 24 February 2015 | TJM signed the Brokermesh Software Licence Agreement. |
| 25 February 2015 | TJM commenced trading on Brokermesh platform. |
| By 28 February 2015 | TJM received the third batch of further onboarding requests from 103 Solo Clients. |

67

| 3-4 March 2015 | TJM's external Compliance Consultant produced a one page "*Solo client review*" memo upon instruction by TJM. |
| 23 March 2015 | The Compliance Consultant confirmed that TJM "*have done everything that is required*" if they carry out PEP and sanction list checks on individuals. |
| By 31 July 2015 | TJM received the fourth batch of further onboarding requests from 75 Solo Clients. ( |
| 28 September 2015 | TJM purportedly executed the last trade for Solo Clients. |

**Ganymede Trade 1**

| 16 June 2014 | TJM received onboarding requests from 3 Solo Clients (Clients D, E and F). |
| 17 June 2014 | TJM received an onboarding request from a Solo Client (Ganymede). |
| 30 June 2014 | A TJM staff member received a call from a Solo Group representative, on his mobile phone, notifying a new group of clients would send emails to TJM for liquidity, he was also instructed to seek from a specific client. |
| 30 June 2014 | TJM executed a set of trades through which Clients D, E and F made an aggregate profit of approximately EUR 2.4 million at Ganymede's loss. |
| 3 July 2014 | TJM Management discussed the trade, noting that traders reported having "*major concerns*", and decided to seek advice from its external Compliance Consultant. |
| 9-10 July 2014 | TJM sought and obtained an explanation for the trades from the Solo Group. |

**Ganymede Trade 2**

| 29 January 2014 | TJM received onboarding requests from 3 Solo Clients (Clients G, H and I). |
| 23 October 2014 | TJM executed a set of trades though which Clients G, H and I made an aggregate profit of approximately EUR 2.3 million profit at Ganymede's loss. |
| 13 November 2014 | TJM Management discussed the trades and concluded that "*these transactions appear at face value to be unusual and required an explanation*", and resolved to discreetly approach Solo Group for an explanation, "*so as not to arose* [sic] *any suspicion*". |
| 25 November 2014 | TJM Management met with a Solo Group representative. |
| 3 December 2014 | TJM Management concluded that the 23 October 2014 trades "*on the face of it are unlikely to involve market abuse and there appears to be no suggestion of criminal activity […] no evidence of money laundering […] no explanation provided thus far*". |

**Ganymede Trade 3**