# Exhibit 145

CONFIDENTIAL
Arthur Woodard - November 18, 2021

Page 1

```
 1            UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF NEW YORK
 2            MASTER DOCKET 18-MD-2865(LAK)
                CASE NO. 18-CV-09797
 3
    _____
 4                                        )
    IN RE:                                )
 5                                        )
    CUSTOMS AND TAX ADMINISTRATION OF     )
 6  THE KINGDOM OF DENMARK                )
    (SKATTEFORVALTNINGEN) TAX REFUND      )
 7  SCHEME LITIGATION                     )
                                          )
 8  _____)
```

C O N F I D E N T I A L

REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL

EXAMINATION OF

ARTHUR WOODARD

DATE: November 18, 2021

REPORTED BY: MICHAEL FRIEDMAN, CCR

CONFIDENTIAL
Arthur Woodard - November 18, 2021

Page 15

```
 1     and Kaye Scholer.
 2         Q    Can you tell us what was the nature
 3     of your practice?
 4         A    In general, I characterize it as
 5     employee benefits.  A lot of people
 6     characterize it as ERISA.  That's sort of the
 7     shorthand, but I think it's a little broader
 8     than that, so I -- that's what I call it.
 9         Q    And as part of your practice, did
10     you deal with retirement plans?
11         A    Yes.
12         Q    And did that include 401(k) plans?
13         A    Yes.
14         Q    And solo 401(k) plans?
15         A    Not typically.
16         Q    What is a -- what is a 401(k) plan?
17         A    I'm sorry?
18         Q    Can you just --
19         A    A 401(k)?
20         Q    Yeah.
21         A    These are -- 401(k) plans are is a
22     defined contribution plan that generally the
23     employer and employee make contributions to
24     in order to build up a retirement benefit on
25     a -- on a before tax basis.
```

1    characterization.
2         I did not work that often with
3    Mr. Ben-Jacob before I retired in some -- a
4    couple of years, I think, he was at the firm
5    before I retired.
6         Q    Did you understand that his client
7    base, as a general matter, were -- were
8    families or individuals with a net worth
9    somewhere between $100 million up to a couple
10   billion dollars?
11        A    No, I did not know with that
12   specificity.
13        Q    Did you generally understand that
14   his practice was focused on high net worth
15   individuals or family offices?
16        A    I really can't answer the question.
17   I -- I don't -- I -- I don't have a good
18   sense of what I thought at that point in
19   time.
20        Q    Did there come a time when you were
21   working with Mr. Ben-Jacob for Argre
22   Management?
23        A    Yes.
24        Q    And what was Argre?
25        A    They were a -- they were basically

```
 1    a group of four individuals that had formed a
 2    partnership for investment, I assume other
 3    purposes.
 4         Q    And did the individuals include
 5    John Van Merkensteijn and Richard Markowitz?
 6         A    Yes.
 7         Q    And how about Luke McGee and
 8    Matthew Stein?
 9         A    I'm sorry, can you repeat it?
10         Q    Luke McGee?
11         A    I don't recollect.
12         Q    Matthew Stein?
13         A    I don't recollect.
14         Q    Jerome Lhote?
15         A    Yeah, I did.
16         Q    And what do you recall of the first
17    transactions in which you were helping
18    Mr. Ben-Jacob with the four individuals that
19    you -- I guess three we've covered, Mr.
20    Merkensteijn, Mr. Markowitz and Mr. Lhote, I
21    think were the names that we -- we mentioned.
22              I think you said there were four
23    individuals but those three names, in
24    particular, you recall?
25         A    Yeah.  My memory is that there were
```

1    four.
2          And -- and you asked about the
3    first transaction.  I'm -- I don't recollect
4    enough to really be able to give you a
5    coherent picture of what the first
6    transaction was.
7       Q    Do you recall generally that you
8    worked with Mr. Ben-Jacob in helping these
9    individuals with respect to a -- a dividend
10   strategy?
11      A    In general, I believe that's a
12   correct statement.
13      Q    Do you recall that the Argre
14   individuals had done some work, some
15   investing with a person called Sanjay Shah
16   and his business in London called
17   Solo Capital?
18      A    I have no recollection of that.
19      Q    Do you recall the name Sanjay Shah?
20      A    Yes.
21      Q    What do you recall about Sanjay
22   Shah?
23      A    That he was involved -- later in
24   the transaction, he was involved on behalf of
25   a company that is escaping me at the moment,

CONFIDENTIAL
Arthur Woodard - November 18, 2021

Page 32

```
 1    recollection, that happened well into -- we
 2    had been working on the transaction for some
 3    time before I knew anything about Solo.
 4         Q    And did you understand that the
 5    Solo fee was about 66 percent, about
 6    two-thirds of the reclaim?
 7         A    That number sounds correct for the
 8    gross fee.  They were -- my memory is that
 9    they were responsible for all expenses, so
10    the fee came down to about 25 percent of net,
11    my memory.
12         Q    And did you understand that the
13    fee, the plans were going to pay the fee to
14    Ganymede?
15         A    No, I have no recollection of that.
16         Q    Now, you see in the -- if you turn
17    to the next page of the document.
18         A    Page?
19              MR. O'CONNOR:  Can you give a Bates
20         number?  I'm not sure what the next page
21         is.
22         Q    Sure.
23              It's -- it's the Bates number --
24    and, sir, that's the -- the long number in
25    the bottom right-hand corner.
```

CONFIDENTIAL
Arthur Woodard - November 18, 2021

Page 33

```
 1        A    I see it.
 2             I appreciate that because I would
 3   not have known.
 4        Q    Yeah.  That's 496.
 5        A    Okay.  496.
 6             MR. O'CONNOR:  Right here.
 7        A    Okay.  I got -- I have it.
 8        Q    And you'll see that the -- the fee
 9   here is the relevant percentage multiplied by
10   the net refund amount.
11        A    I see it.
12        Q    And if you turn, sir, to the
13   document, Bates ending with 500.  5-0-0.
14        A    Yes.
15        Q    You'll see a table there where the
16   relevant percentage is 67.5 percent?
17        A    Yes, I see the table.
18        Q    And did you understand that that
19   was Solo's fee?
20        A    At some point in time I understood
21   that their fee was in the 60, the 70 percent
22   range.
23             My memory is not 67.5.  My memory,
24   it's either 65 or 66, but I -- it's very
25   foggy.
```

CONFIDENTIAL
Arthur Woodard - November 18, 2021

Page 53

```
 1    not have had a contemporaneous discussion
 2    about this at all.
 3        Q    Now, when did you retire, sir?
 4        A    June 30th, 2013.
 5        Q    And do you recall any discussions
 6    prior to your retirement as to whether any
 7    401(k) plans set up by Mr. Markowitz, Mr. Van
 8    Merkensteijn were qualified and met the
 9    qualification requirements?
10        A    What I remember is some plans, I
11    cannot tell you which plans, perhaps all of
12    them, had this -- had entered into a volume
13    submitter arrangement, which, by definition,
14    means that plans are qualified.
15             I have an opinion letter from the
16    IRS that they're qualified.
17        Q    Is one of the -- is one of the
18    requirements for a qualified plan that it be
19    established and operated for the exclusive
20    benefit of the participants or beneficiaries?
21             MR. O'CONNOR:  Objection to form.
22        A    Yes, it is under 401(a).
23        Q    And was there an issue with these
24    plans if they were going to pay two-thirds of
25    the reclaims to Solo as to whether they could
```

1  plan?
2         MR. BAHNSEN:  Objection to form.
3      A    I have no recollection of that.  I
4  can't even read it.
5      Q    Sir, if I could ask you please to
6  turn to Exhibit 4512.
7      A    4512.  I have it.
8      Q    Is this an e-mail that
9  Mr. Ben-Jacob sent to you on or about
10 September 3 of 2013?
11     A    It appears to be.
12     Q    Is this after you had retired?
13     A    Yes.
14     Q    And did you continue to work on
15 these transactions after you had retired?
16     A    Occasionally -- I had an
17 arrangement -- every retired partner had an
18 arrangement with the firm that if they were
19 asked to do something, they could, even
20 though I had -- for example, I had a
21 non-compete also, didn't apply to the firm
22 obviously, and I would get paid some nominal
23 amount for doing that.
24         And I believe that I consulted a
25 few times on Argre in the last six months.  I

CONFIDENTIAL
Arthur Woodard - November 18, 2021

Page 64

```
 1    that out.
 2         Q    Is there any additional issue that
 3    comes to mind?
 4         A    I can say that, to my recollection,
 5    the greatest amount of time was -- involved
 6    prohibited transactions and potential excise
 7    taxes under prohibited transactions that
 8    could apply to one or more entities and/or
 9    individuals in this transaction.
10              I would say more than half of the
11    time probably, maybe even closer to three
12    quarters of the time that I spent was on
13    prohibitive transactions.
14         Q    Mr. Ben-Jacob goes on to say, "And
15    remind them why each is unique, et cetera."
16         A    Again -- well, why -- oh --
17         Q    Do you recall why each of these
18    major issues was unique here?
19         A    I have no idea.
20              You would have to ask Michael what
21    he meant by that word.
22         Q    He goes on to say, "And that when
23    taken together with, little i, the fact that
24    so much of this is facts and circumstances
25    that we would need to assume a way thus
```